IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JAMES O'BRIEN,
      Plaintiff,

vs.                              Case No. 5:04cv228/SPM/EMT

JOHN SEAY, et al.,
      Defendants.
_____/

## REPORT AND RECOMMENDATION

This case filed pursuant to 28 U.S.C. § 2201, 28 U.S.C. § 1336, and Bivens v. Six Unknown Named Agents Fed. Bureau Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), is now before the court upon Defendants' special report and supporting documents filed on February 3, 2006 (Doc. 47).  Plaintiff, an inmate of the Federal Bureau of Prisons proceeding pro se and in forma pauperis, responded to the special report on April 14, 2006 (Doc. 76).  On August 31, 2006, the court entered an order advising the parties of the importance and ramifications of Rule 56 summary judgment consideration, and informing the parties that the special report would be construed as a motion for summary judgment as of September 29, 2006 (Doc. 110).[1]  Neither party has filed additional argument or Rule 56 materials. Upon review of the parties' submissions, it is the opinion of the undersigned that the motion for summary judgment filed by Defendants should be granted.

---

[1]This order extended the court's earlier "submission date" (*see* Doc. 81) for summary judgment materials from May 30, 2006 to September 29, 2006.

I.      BACKGROUND

The parties agree that on August 15, 2002, Plaintiff had an altercation with his cellmate, Delvis Eason[2] (Doc. 47 at 9, Ex. 2; Doc. 76 at 11, Ex. A ¶ 10).  The parties' versions of the facts diverge as to whether or not Plaintiff told Defendants that Plaintiff believed he was in danger.  Plaintiff states that on the same day that Eason was assigned to Plaintiff's cell (August 2, 2002), Plaintiff requested a cell change from Defendant Carey, but Carey told Plaintiff that Defendant Runyon was in charge of assigning cells (Doc. 76, Ex. A ¶ 3).  Also on August 2, 2002, Plaintiff states that he asked Runyon for a cell change and told Runyon that Plaintiff had problems with Eason in the past, "even to the point that Eason had threatened [Plaintiff] at another federal facility" (*id.*, Ex. A ¶ 4).  On August 6, 2002, Plaintiff states that he again asked Runyon for a cell change because "problems were escallating [sic]," and Eason had threatened Plaintiff if Plaintiff did not pay Eason money (*id.*, Ex. A ¶ 5).  Plaintiff repeated his concerns of escalating problems to Runyon on August 8, 2002, and Plaintiff told Runyon that he felt he was in danger (*id.*, Ex. A ¶ 6).  Plaintiff also gave Runyon an informal grievance (BP-8) on August 8, 2002 requesting a cell change because of "serious problems" that Plaintiff had with Eason (*id.*, Ex. A ¶ 7; Doc. 6, Ex. A pt. 1).  Plaintiff states that Runyon failed to investigate Plaintiff's allegations, and denied his request for a separation, but told Plaintiff he would place Plaintiff in a "6–8 man cell" if Plaintiff continued to ask for a separation (Doc. 76, Ex. A ¶¶ 4–7).

Additionally, Plaintiff contends that, on August 9 and 15, 2002, he told Defendant Hall that he felt threatened by Eason and that he would like a separation (*id.*, Ex. A ¶¶ 8–9).  On August 9, 2002, Plaintiff told Hall that he felt threatened by Eason, and Hall told Plaintiff that only Runyon could make cell changes (*id.*, Ex. A ¶ 8).  On August 15, 2002, Plaintiff told Hall that Eason had a knife and had broken into Plaintiff's locker, and Hall took Plaintiff to see the unit manager,

---

[2]The court conveys as facts those factual allegations contained in Plaintiff's affidavits in support of his motion for summary judgment and attachments (Doc. 76), Plaintiff's affidavits in support of his motion in opposition to Defendants' motion to dismiss and attachments (Doc. 6), and Defendants' affidavits in support of their motion for summary judgment and attachments (Doc. 47), which comply with the requirements for affidavits specified in Rule 56: that they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); *see, e.g.*, Dickinson v. Wainwright, 626 F.2d 1184, 1186 (5thCir. 1980); Murrell v. Bennett, 615 F.2d 306, 310 n.5 (5thCir. 1980).

Defendant Castro (*id.*, Ex. A ¶ 9).  After Plaintiff repeated all of the allegations to Castro, including the fact that Eason had a knife, Castro told Plaintiff that he would separate Plaintiff and Eason the next day (*id.*, Ex. A ¶ 10).  However, the same day Plaintiff spoke with Castro and before Plaintiff and Eason were separated, Eason attacked Plaintiff (*id.*, Ex. A ¶ 10).

In contrast, Defendants Runyon and Castro assert that they do not recall either Plaintiff or the altercation, but that if they denied Plaintiff's request for a cell change it would have been because Plaintiff presented no evidence to support his claims of danger (Doc. 47, Ex. 6 ¶ 5, Ex. 5 ¶¶ 3, 5).  Defendant Carey does recall Plaintiff but does not recall Plaintiff indicating any problems with Eason (*id.*, Ex. 4 ¶ 3).  Additionally, Defendants state that if Plaintiff had any previous history of problems with Eason, they would not have been incarcerated at the same institution or in the same cell (*id.*, Ex. 4 ¶ 5, Ex. 5 ¶ 6, Ex. 6 ¶ 6).  Finally, Defendants' unrefuted evidence shows that Plaintiff never requested protective custody from Eason and that a cell change would not have alleviated Plaintiff's problems with Eason because they would have remained in the same housing unit and general population together (*id.*, Ex. 5 ¶ 7, Ex. 6 ¶ 7).

The parties agree that immediately after the altercation, on August 15, 2002, Plaintiff was examined by FCI Marianna staff (Doc. 47 at 11, Ex. 3 at 1; Doc. 76 at 2, Ex. A ¶ 12).  Medical staff found an area of edema to the right side of Plaintiff's head behind the ear, mild tenderness to the base of his neck and left thoracic back, and mild tenderness to the left scapula; they further found that Plaintiff could move all of his extremities without difficulty (Doc. 47 at 11, Ex. 3 at 1; Doc. 76 at 2).  Plaintiff was instructed to rest and use an ice pack on his neck, back, and head for twenty minutes at a time, and he was given one 400 mg. tablet of Motrin for his pain (Doc. 47 at 11, Ex. 3 at 1; Doc. 76 at 2).[3]  The next day, August 16, 2006, Plaintiff states that he informed Defendant Morales of his pain from the altercation, but Morales refused to provide additional treatment (Doc. 76 at 3, Ex. A ¶¶ 13–14).  The parties agree that Plaintiff was treated again on August 19, 2002 (Doc. 47 at 11, Ex. 3 at 2; Doc. 76 at 3, Ex. A  ¶ 15).  At that time Defendant Morales found that

---

[3]Plaintiff stated in his original complaint that it "was not until Aug. 19, 02, four days after the incident that plaintiff received any pain medication" (Doc. 1, attach. 1 ¶ 15).  However, Plaintiff now admits (and his medical records show) that he was given Motrin on August 15, 2002, immediately after the incident (Doc. 76 at 2; Doc. 47, Ex. 3 at 1).

Plaintiff was ambulatory without distress, Plaintiff was diagnosed with muscle spasms secondary to low back pain, and he was provided 400 mg. Motrin for pain (*id.*).  Although Plaintiff asserts that he informed Morales that he could "not take motrin alone in high dosages or long periods of time because it causes internal bleeding" (Doc. 76, Ex. A ¶ 15), Plaintiff's medical records contain no record of this statement (*see* Doc. 47, Ex. 3 at 2).

On August 22, 2002, Plaintiff reported that he had noticed traces of blood in his stool, and he was seen by medical staff (Doc. 47 at 11, Ex. 3 at 3; Doc. 76, Ex. A ¶ 16).  Plaintiff's medical records reveal that staff performed a rectal examination that revealed no hemorrhoids, soft stool that was negative for blood, and no other abnormalities (Doc. 47, Ex. 3 at 3).  Plaintiff was diagnosed with chronic back and knee pain and stomach irritation from the use of NSAIDs (*id.*, Ex. 3 at 3). Accordingly, Plaintiff's Motrin was taken from him, and Plaintiff stated that he was not pleased that he was not being given "pain pills" (*id.*, Ex. 3 at 3). Plaintiff does not dispute the medical findings from August 22, but he states that no physical examination was done on his back and neck (Doc. 76, Ex. A ¶ 16).  A follow-up on August 23, 2002 revealed tenderness with extension of Plaintiff's back, but no bruising or discoloration, and no deformity or restricted range of motion in Plaintiff's spine (Doc. 47, Ex. 3 at 4).  The staff prescribed 25 mg. Atarax (generic name: hydroxyzine hydrochloride) and 20 mg. Feldene (generic name: piorxicam), ordered thoracic and cervical x-rays, instructed Plaintiff to rest for three days increasing his activity as tolerated, and told Plaintiff to report any adverse effects of the medications (*id.*, Ex. 3 at 4; Doc. 76, Ex. A ¶ 17).  Again, Plaintiff does not specifically dispute the evidence in his medical records from August 23, but he alleges that no "physical examination" was done to his back and neck (Doc. 76, Ex. A ¶ 17).

On August 27, 2002, Plaintiff had a "Chronic Care" appointment, and he mentioned to the doctor that he had severe pain because of his neck and back (*id.*, Ex. A ¶ 18).  Plaintiff's medical records show that his prescription of Feldene was changed to 650 mg. Tylenol for pain; he was also prescribed 75 mg. Effexor, 300 mg. Neurontin, and Prevacid (Doc. 47, Ex. 3 at 4).  In addition, the staff requested x-rays and instructed Plaintiff to return in one to two weeks (*id.*, Ex. 3 at 4–5, 43). As above, Plaintiff does not dispute these records, but again states that no "physical examination" was done to his back and neck (Doc. 76, Ex. A ¶ 18).

Plaintiff's medical records show that he was seen by medical staff several more times: (1) on August 28, 2002 for a refill of Atarax (Doc. 47, Ex. 3 at 5–6); (2) on September 3, 2002 for a refill of Feldene (*id.*, Ex. 3 at 6); and (3) on September 4, 2002, at which time Plaintiff told medical staff that Feldene was not sufficient for his pain, and staff additionally prescribed 325 mg. Tylenol after noting that Plaintiff was moving slowly and favoring his back (*id.*, Ex. 3 at 6).  Plaintiff's x-rays, performed on September 7, 2002, revealed no defect in Plaintiff's chest, cervical spine, or thoracic spine, but they did reveal a "pars defect at L5-51" with "anterior slippage of L5 on S1 Grade 1" and "gas . . . within the L5-51 disc space" (*id.*, Ex. 3 at 43).  Plaintiff does not dispute any of these records (*see* Doc. 76, Ex. A).  Finally, Plaintiff states that he was transferred from FCI Marianna on September 18, 2002, and arrived at USP Atlanta on September 20, 2002 (*id.*, Ex. A ¶¶ 25–26).  While he was incarcerated in Atlanta between September 20 and October 10, 2002, Plaintiff alleges he received no medical treatment (*id.*, Ex. A ¶ 26).

The parties' facts differ as to the grievances filed by Plaintiff regarding these issues.  Plaintiff states that he submitted an informal grievance against Runyon to Runyon and handwritten requests or complaints against the medical staff to Associate Warden Willingham, Defendant Seay, and Defendant Barrios (*id.*, Ex. A ¶¶ 7, 20).  During the first week of September 2002, Plaintiff states that he requested from Defendant Carey two BP-9 forms on which to file formal grievances with the warden, and Carey provided those forms to Plaintiff (*id.*, Ex. A ¶ 21).  Plaintiff completed both grievances (one regarding Defendants Hall and Runyon's failure to protect and one regarding his claim that Defendants Morales, Seay, and Barrios provided Plaintiff inadequate medical care) using carbon paper (*id.*, Ex. A ¶¶ 23–24, Ex. B).  Plaintiff asserts that on September 15, 2002, he gave Defendant Carey his BP-9 against Defendant Runyon and asked Carey who would be filing his grievance (*id.*, Ex. A ¶ 23).  When Carey replied that Runyon would be filing the grievance, Plaintiff told Carey that the grievance was against Runyon, so Carey told Plaintiff that the grievance would instead be given to Defendant Kessler to be filed and processed (*id.*, Ex. A ¶ 23).  On September 18, 2002, as Plaintiff was being transferred, he alleges that he gave his BP-9 against the medical staff to Ms. Daub, who told him that she would forward it to Carey (*id.*, Ex. A ¶ 24).  FCI Marianna has no record of either BP-9 and denies that they were filed (Doc. 47 at 8, Ex. 8 ¶¶ 3–7).

On November 4, 2002, Plaintiff sent a letter to the Administrative Remedy Coordinator at FCI Marianna requesting the status of his two BP-9 grievances, and attaching carbon copies of what he had typed on the grievances (Doc. 76 at 7, Ex. A ¶ 28, Ex. C).  The carbon copies attached by Plaintiff include only the blocks of text that Plaintiff typed on the BP-9 form; they do not include any part of the BP-9 form itself or any of the exhibits Plaintiff alleges were attached by him to the BP-9 grievances (*see id.*, Ex. B).  On November 25, 2002, the warden's secretary, Iris Bashford, sent Plaintiff a letter informing him that FCI Marianna had no record of BP-9 grievances filed by him at that institution (*id.* at 7, Ex. D).

After receiving Bashford's response, instead of attempting to refile at the institution level,[4] Plaintiff states that he submitted two BP-10 grievances in the same envelope to the regional office of the BOP (*id.* at 7, Ex. A ¶ 29).  The first, dated December 18, 2002, was against Runyon, and the second, dated December 20, 2002, was against the medical staff (*id.*, Ex. A ¶ 29, Ex. E, Ex. F).  On January 7, 2003, Plaintiff's BP-10, dated December 20, 2002, against the medical staff was rejected because Plaintiff failed to file a BP-9 on the issue; the rejection instructed Plaintiff to file a BP-9 (Doc. 6, Ex. A, pt. 3; Doc. 47, Ex. 8 ¶ 4).  After receiving the rejection notice on January 21 or 23, 2003, instead of attempting to refile a BP-9, Plaintiff filed a BP-11 with the BOP central office in Washington on January 24, 2003 (Doc. 6, Ex. A, pt. 3; Doc. 76, Ex. A ¶ 31, Ex. G).  On February 5, 2003, the central office rejected Plaintiff's BP-11 against medical staff because he had not yet filed a BP-9; the central office instructed Plaintiff to file a BP-9 (Doc. 6, Ex. A, pt. 3; Doc. 47, Ex. 8 ¶ 5).

The prison denies receiving Plaintiff's BP-10, dated December 18, 2002, against Runyon (Doc. 76, Ex. A ¶ 30).  Plaintiff sent a letter to the regional office dated March 21, 2003, attaching

---

[4]In his motion for summary judgment, Plaintiff states that he received a response from Bashford, and in the next paragraph he states that he "resubmitted copies of his BP-9's to FCI Marianna.  He still received no response.  Therefore . . . [Plaintiff] filed two BP-10's . . . ." (Doc. 76 at 7).  It is unclear whether, when he says he resubmitted his BP-9 grievances, Plaintiff means that he refiled his BP-9 grievances *after* he received Bashford's response or whether he is referring to the carbon copies he attached to his November 4, 2002 letter to Bashford.  It appears that Plaintiff means the latter, because in his attached affidavit, Plaintiff states that he "made a second submission of his two BP-9's [sic] grievances *with* a November 04, 2002 Letter to the Administrator Remedy Coordinator" (*id.*, Ex. A at ¶ 28 (emphasis added)).  Further, Plaintiff does not allege and provides no evidence, in his sworn affidavit or elsewhere, that he correctly refiled his BP-9 grievances after he received Bashford's response.

a copy of his BP-10 against Runyon, and requesting the status of his BP-10 grievance (*id.*, Ex. A ¶ 30; Doc. 6, Ex. D).  On April 1, 2003, the deputy regional counsel responded that there was no record of the BP-10 dated December 18, 2002 filed with their office (Doc. 76, Ex. A ¶ 30; Doc. 6, Ex. D).  On April 9, 2003, after receiving the letter from the regional counsel, Plaintiff sent a letter to the Administrative Remedy Coordinator requesting the status of his BP-10 grievances (Doc. 6, Ex. D).  The Administrative Remedy Clerk responded the next day, listed the grievances that had been received by the regional and central offices, and instructed Plaintiff to contact the post office regarding any mail that might have been lost (*id.*, Ex. D).  On April 22, 2003, Plaintiff filed a BP-11 with the central office against Runyon (Doc. 76, Ex. A ¶ 31, Ex. G).  On May 5, 2003, the central office rejected the BP-11 on Runyon because Plaintiff had failed to file a BP-9 (Doc. 6, Ex. A, pt. 1).

## II.    PROCEDURAL HISTORY

Plaintiff originally filed his complaint pursuant to 28 U.S.C. § 2201 and <u>Bivens</u> against thirteen Defendants: United States of America, Bureau of Prisons, Warden Henry, Mr. Castro, Mr. Runyon, Mr. Carey, Mr. Morales, Mr. Kessler, Dr. Barrios, Associate Warden Willingham, Mr. Hall, Mr. G.E. McBride, and Mr. Seay[5] (Doc. 1, attach. 1 at 1).  Plaintiff filed in the district court for the District of Columbia, where his complaint was served on the Defendants and then transferred to this court (*id.*, attach. 1 at 1).  This court dismissed Plaintiff's claims concerning the disciplinary action taken against him and his claims against Defendants G.E. McBride, United States of America, Bureau of Prisons, Warden Henry, and Associate Warden Willingham (Docs. 14, 21).  Plaintiff proceeded on his claims against the remaining Defendants: (1) Plaintiff seeks to hold Defendants Runyon, Hall, and Castro liable for failing to protect him (Doc. 1, attach. 1; Doc. 76); (2) he seeks to hold Defendants Seay, Morales, and Barrios liable for failing to provide adequate medical treatment (Doc. 1, attach. 1; Doc. 76); and (3) he seeks to hold Defendants Carey and Kessler liable

---

[5]Plaintiff listed "Mr. Cee" as a Defendant, but it was later determined that the correct spelling of this Defendant's surname was "Seay," and the clerk was directed to correct the docket (*see* Doc. 79).  A similar finding was made as to Defendant Kessler, who Plaintiff originally listed as "Mr. Kysler" (*id.*).

for violating Plaintiff's due process rights by failing to file Plaintiff's BP-9 grievances[6] (Doc. 6 at 6–7).  As relief, Plaintiff seeks a declaration that his civil rights were violated, compensatory damages for his pain and suffering, attorney's costs, and "other relief which the court deems proper" (Doc. 1, attach. 1 ¶¶ 24–27).

Defendants, in their motion for summary judgment, argue that they are entitled to summary judgment both because Plaintiff failed to exhaust his administrative remedies (Doc. 47 at 6–9) and because Plaintiff's complaint fails to establish a violation of the Eighth Amendment for either failure to protect or inadequate medical care (*id.* at 9–19).[7]  They contend that Plaintiff's statements do not show that a substantial risk of serious harm existed from Plaintiff's cellmate, and at most Defendants were negligent in failing to give Plaintiff a cell change (*id.* at 15–16).  Further, Defendants argue that they did not exhibit deliberate indifference to Plaintiff's medical needs, because they had no knowledge of any risk of serious harm to Plaintiff's health based on their medical care (*id.* at 18–19).

Plaintiff responded to Defendants' motion (Doc. 76).  In Plaintiff's response he asserts that he did exhaust his administrative remedies, because he "'fully pursued' 'all available' remedies in 'good faith' and 'diligently' prior to filing a complaint in federal court" (*id.* at 10).  Next, Plaintiff contends that Defendants violated his Eighth Amendment right to adequate medical treatment and that Defendants had a duty to protect Plaintiff from assault by his cellmate (*id.* at 16–17).

III.   DISCUSSION

A.   Summary Judgment Standard

In order to prevail on their motion for summary judgment, Defendants must show that Plaintiff has no evidence to support his case or present affirmative evidence that Plaintiff will be unable to prove his case at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).  If Defendants successfully negate an essential element of Plaintiff's case, the burden shifts to Plaintiff to come forward with evidentiary material

---

[6]Although Plaintiff failed to specifically assert  due process claims against Defendants Carey and Kessler in his complaint and failed to address such claims in his response to Defendants' motion for summary judgment (*see* Doc. 1, attach. 1; Doc. 76), Plaintiff did raise them in his response (Doc. 6) to Defendants' motion to dismiss.  In light of Plaintiff's pro se status, the court will address the merits of Plaintiff's due process claim.

[7]Defendants do not address Plaintiff's Due Process claims against Defendants Carey and Kessler.

demonstrating a genuine issue of fact for trial.  *Id.*  The "mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."  <u>Anderson v. Liberty Lobby, Inc.</u>,  477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law."  *Id.*; *accord* <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 998 (11th Cir. 1992).  Further, Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence or conclusory allegations is insufficient. <u>Celotex Corp.</u>, 477 U.S. at 324.  Plaintiff must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *Id.*; <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997) ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'") (quoting <u>Celotex Corp.</u>, 477 U.S. at 324); <u>Hammer v. Slater</u>, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by Plaintiff in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to Plaintiff. <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); <u>Jones v. Cannon</u>, 174 F.3d 1271, 1282 (11th Cir. 1999).  A motion for summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; <u>Celotex Corp.</u>, 477 U.S. at 322.

B.      Exhaustion

Defendants first move for summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies.  Inmates bringing <u>Bivens</u> suits must first exhaust their administrative remedies under the Bureau of Prisons Administrative Remedy Procedure for Inmates, 28 C.F.R. §§ 542.10–542.19, before seeking relief in the federal courts.  <u>McCarthy v. Madigan</u>, 503 U.S. 140, 112 S. Ct. 1081, 1086, 117 L. Ed. 2d 291 (1992); <u>Irwin v. Hawk</u>, 40 F.3d 347; <u>Caraballo-</u>

Sandoval v. Honsted, 35 F.3d 521, 525 (11th Cir. 1994).  Similarly, Title 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act of 1996, provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Exhaustion of all available administrative remedies is mandatory and is a precondition to suit. Woodford v. Ngo, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006) (citing Booth v. Churner, 532 U.S. 731, 739, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001)); Porter v. Nussle, 534 U.S. 516, 524, 122 S. Ct. 983, 988, 152 L. Ed. 2d 12 (2002); *see also* Alexander v. Hawk, 159 F.3d 1321, 1325–28 (11th Cir. 1998).  The exhaustion requirement applies to *all* inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.  Porter, 534 U.S. at 524.  Exhaustion is required whether the plaintiff seeks declaratory and injunctive relief, monetary damages, or both.  Booth, 532 U.S. at 739–40; *see also* Zolicoffer v. Scott, 55 F. Supp. 2d 1372, 1375 (N.D. Ga. 1999), *aff'd*, 252 F.3d 440 (11th Cir. 2001). The requirement is not subject to either waiver by a court or futility or inadequacy exceptions.  *See* Booth, 532 U.S. at 741 n.6; Madigan, 503 U.S. 140 ("Where Congress specifically mandates, exhaustion is required."); Alexander, 159 F.3d at 1325.  "A claim that fails to allege the requisite exhaustion of remedies is tantamount to one that fails to state a claim upon which relief may be granted."  Rivera v. Allin, 144 F.3d 719, 731 (11th Cir. 1998).

The Supreme Court recently reaffirmed the importance of the exhaustion requirement, calling it the "centerpiece" of the PLRA.  Woodford, 126 S. Ct. at 2382.  In Woodford, the Court elaborated on the meaning of "exhausted" and found that the "PLRA exhaustion requirement requires proper exhaustion."  *Id.* at 2387.  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Id.* at 2386.  The Court explained that, to realize the benefits of exhaustion, a prison grievance system must be "given a fair opportunity to consider the grievance," and the system would not have such an opportunity "unless the grievance complies with the system's critical procedural rules."  *Id.* at 2388.  Giving the word "exhausted" any other meaning would allow a prisoner to easily bypass the administrative process

"by violating . . . procedural rules until the prison administration has no alternative but to dismiss the grievance on procedural grounds." *Id.* "[T]he PLRA did not create such a toothless scheme." *Id.* Thus, the Court rejected the "narrow technical definition of exhaustion that applies in habeas." *Id.* at 2392. Based on the foregoing, the court must dismiss this action if it determines that Plaintiff failed to properly exhaust his available administrative remedies with respect to his claims prior to filing suit. *Id.* at 2387; Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000); Alexander, 159 F.3d at 1325–26.

The Bureau of Prisons (BOP) provides a four level administrative grievance procedure for prisoner complaints. 28 C.F.R. §§ 542.10–542.19. Initially, prisoners must seek resolution of issues through informal grievances (on form BP-8). *Id.*, § 542.13(a). If unsuccessful, an inmate may then file a formal written complaint (on form BP-9) with the institution within twenty calendar days following the date on which the basis for the grievance occurred. *Id.*, § 542.14(a). An appeal (on form BP-10) from the institution's decision may then be taken to the Regional Director. *Id.*, § 542.15. In addition, four types of grievances (sensitive issues in which the inmate's well-being would be placed in danger by filing the grievance at the institution, DHO appeals, control unit appeals, and controlled housing status appeals) may be filed directly with the Regional Director, bypassing the institution level. *Id.*, § 542.14(d). Finally, an inmate may appeal (on form BP-11) the Regional Director's response to the General Counsel for the Bureau of Prisons. *Id.*, § 542.15(a). An inmate may not appeal to the Regional Director or the General Counsel any issues not raised in lower level filings. *Id.*, § 542.15(b)(2). Each of these steps is required to satisfy the exhaustion prerequisite.

Viewing the evidence in the light most favorable to Plaintiff, he has failed to establish that he exhausted his administrative remedies, because he never exhausted at the institutional level. Plaintiff states that he gave his first BP-9, against Runyon, to Defendant Carey on September 15, 2002; Carey told Plaintiff that his BP-9 would be given to Defendant Kessler to be filed and processed (Doc. 76, Ex. A ¶ 23). Further, Plaintiff alleges that he gave his second BP-9, against the medical staff, to Ms. Daub on September 18, 2002; Daub told Plaintiff that she would forward his BP-9 to Carey (*id.*, Ex. A ¶ 24). When Plaintiff received no response to his grievances, he wrote a letter, dated November 4, 2002, to the Administrative Coordinator and attached carbon copies of the

text he had typed on the complaint forms (*id.*, Ex. A ¶ 28, Ex. B, Ex. C).  Bashford, the warden's secretary, responded to Plaintiff on November 25, 2002 and informed him that the warden had not received his complaints (*id.*, Ex. A ¶ 28, Ex. D).  After receiving Bashford's letter (*see id.* at 7), Plaintiff did not attempt to refile his BP-9 grievances but instead filed two BP-10 grievances (*id.*, Ex. A ¶ 29, Ex. E, Ex. F).  After the regional office instructed Plaintiff that he needed to file BP-9 grievances before filing BP-10 grievances (Doc. 6, Ex. A, pt. 3; Doc. 47, Ex. 8 ¶ 4), Plaintiff instead filed two BP-11 grievances with the central office (Doc. 6, Ex. A, pt. 3; Doc. 76, Ex. A ¶ 31, Ex. G).  Both BP-11 grievances were rejected because Plaintiff had not filed BP-9 grievances (Doc. 6, Ex. A, pts. 1 and 3).  Once again, instead of attempting to refile the BP-9 grievances, Plaintiff proceeded to the next level and brought the instant action in federal court, asserting that he made a "good faith" effort to exhaust his administrative remedies (Doc. 76 at 10).

Plaintiff did not allow FCI Marianna "a fair opportunity to consider [his BP-9] grievances." Although Plaintiff alleges that he filed BP-9s at the institutional level "twice" (*id.*), he admits that the first time his grievances never reached the warden.  Plaintiff states that these grievances "misteriously [sic] disappeared, or were lost" (Doc. 76 at 6).[8]  The second time that Plaintiff allegedly "filed" at the institutional level is when he attached carbon copies of the text he typed on the BP-9 forms to his letter to Bashford.  Contrary to Plaintiff's assertions, his letter with carbon copies attached was not a "filing" of his BP-9 grievance with the warden.  The attached carbon copies were neither on the correct form nor sent to the warden through the institution staff member designated to receive them, as required in the BOP grievance guidelines.  *See* 28 C.F.R. §§ 542.14(c)(1), -(4).  In addition, they were not sent alone but were attached as exhibits to a letter requesting the status of the grievances (*see* Doc. 76, Ex. C).  Thus, Plaintiff did not "properly exhaust" his remedies at the institutional level, was not entitled to proceed to the regional or national level (as those levels informed him), and was similarly not entitled to file an action in this court.

To the extent Plaintiff is suggests that refiling his BP-9 grievances with the warden would have been futile or that no remedies were "available," his suggestion is neither supported by facts

---

[8]In addition, Plaintiff seeks to recover against Defendants Carey and Kessler for failing to file his grievances, suggesting that Plaintiff believes his grievances were never filed with the warden.

nor by law.  First, the warden's failure to respond to the grievances that the warden had not received did not render the remedies at the institutional level "unavailable," because Plaintiff was notified that the warden had not received his grievances and was directed to refile the BP-9s with the warden. *See* Jernigan v. Stuchell, 304 F.3d 103 (10th Cir. 2002) (finding that where grievance submitted to warden was allegedly lost or misfiled and inmate did not refile with the warden as instructed by the director, inmate had not exhausted his remedies and was not entitled to file in federal court).  Next, the facts demonstrate that administrative remedies at the institutional level were in fact "available." Plaintiff does not allege that he was unable to request or receive the correct forms to properly refile his BP-9 grievances once Bashford informed him that the warden's office had not received his original BP-9s.  Further, Plaintiff does not allege that it would have been difficult for him to refile at the institutional level.  Indeed, the fact that Plaintiff was able to file BP-10 and BP-11 grievances indicates that he had access to the correct forms, to a typewriter, and to the grievance process in general.  His refusal to attempt to properly refile his BP-9 grievances, even after Bashford informed him that the warden's office had not received the BP-9s and the regional and national offices instructed him to refile the BP-9s, indicates only that Plaintiff was determined to proceed with the grievance procedure prematurely and willfully ignore instructions to refile the BP-9s.  Finally, even if Plaintiff were correct in his suggestion that refiling at the institutional level would have been futile, futility or unavailability of remedies is not an exception to the exhaustion requirement.  *See* Booth, 532 U.S. at 741 n.6; Madigan, 503 U.S. 140; Garcia v. Glover, 2006 U.S. App. LEXIS 24285 (11th Cir. Sept. 26, 2005) (finding that prisoner had not exhausted with respect to his claim that he was physically assaulted by five officers, even where he alleged that he had not filed a grievance because he feared that filing a grievance would put his life in danger from the same officers that assaulted him).

Plaintiff raises two additional arguments regarding exhaustion.  One, he states that the main purpose of the grievance procedure is to provide prisoners with "what will often be the most efficient mechanism to remedy the violation of federal law" (Doc. 76 at 9).  Accordingly, Plaintiff suggests that failure to follow a prison's procedural requirements cannot render an inmate's claims unexhausted (*id.*).  Plaintiff cites Thomas v. Woolum, 337 F.3d 720 (6th Cir. 2003) in support of his argument.  However, Plaintiff's argument is contradicted by the holding and reasoning of the

Supreme Court's most recent case on exhaustion, <u>Woodford v. Ngo</u>, which overruled <u>Thomas</u> in pertinent part. *See* <u>Woodford</u>, 126 S. Ct. at 2384. As the Court confirmed, the requirement that a prisoner exhaust his administrative remedies is not just to benefit the prisoner, but also the prison. Thus, Plaintiff's suggestion that he was entitled to appeal to the next level when the warden did not respond to the BP-9s that the warden had not received, is without merit. Rather, Plaintiff should have refiled his BP-9 grievances with the warden to give the prison a chance to consider them.

Two, Plaintiff states that he "fully pursued" all remedies in "good faith," even while prison officials made "every attempt to prevent" him from exhausting (Doc. 76. at 10). While some courts have found that an inmate exhausted a level of the grievance procedure when prison officials affirmatively prevented the inmate from filing a grievance at that level, *see* <u>Miller v. Norris</u>, 247 F.3d 736, 740 (8th Cir. 2002) (inmate repeatedly denied grievance forms after requesting them); <u>Brown v. Cloak</u>, 312 F.3d 109 (3d Cir. 2002) (prison officials lied to inmate and told him he could not file until their investigation was over), there is no evidence to support Plaintiff's assertion in the instant case that prison officials made *any* attempt to prevent Plaintiff from exhausting. Plaintiff admits that Defendant Carey brought him grievance forms as soon as he requested them (Doc. 76, Ex. A ¶ 21), that Plaintiff received prompt replies to every letter he sent to administrative officials (*id.*, Ex. A ¶¶ 28, 30), and that his original BP-9 grievances each had to go through the hands of at least two people before reaching the warden (*id.*, Ex. A ¶¶ 23, 24).[9] Plaintiff does not allege that any officials lied to him regarding his BP-9s, denied him access to proper forms, or threatened him in any way if he filed grievances. In fact, officials repeatedly told him to refile. Further, it is clear that Plaintiff had access to grievance forms, mail, and a typewriter. Thus, while the facts may indicate that some prison officials were negligent in their handling of Plaintiff's original BP-9s, the facts do not support Plaintiff's assertions that prison officials made "every attempt" to prevent him from exhausting.

---

[9]In fact, Plaintiff handed his second BP-9, against the medical staff, to Officer Daub in Receiving and Discharging as he was being transferred; Daub was to send the grievance to Carey, who presumably would have given it to either Kessler or Runyon to file with the warden (*see* Doc. 76, Ex. A ¶¶ 23, 24).

Thus, Defendants are entitled to summary judgment for Plaintiff's failure to exhaust administrative remedies.  However, even if Plaintiff had exhausted his administrative remedies, his claims are subject to dismissal on the merits.

C.      Failure to Protect Claim

Defendants move for summary judgment on the ground that Plaintiff cannot establish a violation of his Eighth Amendment right to have prison officials protect him from violence by other prisoners.  To state a claim for cruel and unusual punishment, "there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to constitutional stature."  Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir. 1982) (quoting Wright v. El Paso County Jail, 642 F.2d 134, 136 (5th Cir. 1981)).  "An official's deliberate indifference to a known danger violates inmates' Eighth Amendment rights."  McCoy v. Webster, 47 F.3d 404, 407 (11th Cir. 1995).  Prison officials have a duty to protect prisoners from violence at the hands of other prisoners.  Farmer v. Brennan, 511 U.S. 825, 833,114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994) (citations omitted); McCoy, 47 F.3d at 407 ("When officials become aware of threats to an inmate's health and safety, the eighth amendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection.") (citation omitted).  However, not every injury suffered by one prisoner at the hands of another translates into constitutional liability for the prison officials responsible for the victim's safety.  Farmer, 511 U.S. at 834, 114 S. Ct. at 1977.  To be held liable under the Eighth Amendment for failing to prevent an attack from other inmates, a correctional official must be found to have known and recklessly disregarded "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S. Ct. at 1979.  Proof that a defendant should have but did not perceive a risk is insufficient. Id. at 838, 114 S. Ct. at 1979 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."); Campbell v. Sikes, 169 F.3d 1353, 1364 (11th Cir. 1999). Whether an officer had the requisite knowledge of a substantial risk may be deduced from circumstantial evidence such as the obviousness of the situation confronting the officer. Farmer, 511 U.S. at 842, 114 S. Ct. at 1981.

Furthermore, "[f]or a claim based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 835, 114 S. Ct. at 1977.  The risk of attack must have been substantial, beyond mere possibility. Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam), cert. denied, 496 U.S. 928 (1990).  Absent special circumstances, general hostilities exhibited by prisoners do not alone amount to a "substantial risk of serious harm." See Brown, 894 F.2d at 1537 (finding defendants informed of "racial problem" in victim's cell not liable).  Correspondingly, a negligent failure to protect an inmate does not state a claim under § 1983.  Davidson v. Cannon, 474 U.S. 344, 347–48, 106 S. Ct. 668, 670, 88 L. Ed. 2d 677 (1986).  Moreover, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 114 S. Ct. at 1982–83.

Thus, in order to demonstrate liability, Plaintiff must produce sufficient evidence of a substantial risk of serious harm, and he must also show that Defendants were deliberately indifferent to that risk.  Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995).  Additionally, causal links must be established between Defendants' deliberate indifference and the substantial risk to Plaintiff, as well as between the risk to Plaintiff and his actual injury.  Id.

Viewing the evidence in the light most favorable to Plaintiff, he has failed to establish that Defendants violated his Eighth Amendment rights by failing to protect him from his cellmate, Eason. Regarding Defendant Runyon, Plaintiff has not shown that Runyon knew of and recklessly disregarded an excessive risk to Plaintiff.  Plaintiff has stated that he told Runyon three times (on August 2, 6, and 8, 2002) and through an informal grievance that Eason and Plaintiff had previous problems rising "to the point that" Eason threatened Plaintiff at another federal facility, that Eason had "threatened" Plaintiff while they were cellmates at FCI Marianna, and that Plaintiff had "serious problems" with Eason (Doc. 76, Ex. A ¶¶ 4–7; Doc. 6, Ex. A pt. 1).[10]  Based on these facts, it cannot

---

[10]Plaintiff also alleges that Runyon "skipped" Eason to the front of the line of inmates waiting to be placed into a two-man cell and "deliberately" placed Eason into Plaintiff's cell (Doc. 76, Ex. A ¶ 4).  Initially, Plaintiff has not demonstrated how he knows this information, and has provided no evidence to support his allegation, especially if Plaintiff is suggesting that Runyon placed Eason into Plaintiff's cell intending to harm Plaintiff.  This court will not accept as fact an allegation in an affidavit not supported by evidence or based on personal knowledge.  See Fed. R. Civ. P. 56(e).  On the other hand, to the extent Plaintiff means that Runyon placed Eason "deliberately," as opposed to "accidentally," this assertion provides no support for Plaintiff's failure to protect claim.

be said that Runyon recklessly disregarded an "excessive" risk to Plaintiff's safety: Plaintiff made only general assertions that Eason "threatened" him, but Plaintiff did not specifically tell Runyon that Eason threatened Plaintiff's life or threatened to attack him; Plaintiff refused Runyon's offer of a cell change and did not request protective custody; and Plaintiff admits that his past history with Eason did not rise beyond a threat, so Plaintiff does not dispute that the prison had no record of a bad history between Plaintiff and Eason (*see* Doc. 76, Ex. A ¶¶ 4, 6).  At most, Plaintiff has established that Runyon knew of "general hostilities" between Plaintiff and Eason, but general hostilities alone do not amount to substantial risk of serious harm.  Even if Runyon did know of an excessive risk of serious harm, Runyon acted reasonably by offering Plaintiff a cell change, even if the change was to a less desirable cell.

Next, Plaintiff has also failed to state a claim against Defendants Hall and Castro.  First, for the same reasons as above, Plaintiff's statements to Hall on August 9, 2002, that Plaintiff "felt threatened" by Eason were insufficient to notify Hall of an "excessive risk" to Plaintiff's safety.  Next, assuming that Plaintiff's allegations to Hall on August 15, 2002, that Eason had a knife and had broken into Plaintiff's locker, together with Plaintiff's allegations that Eason had been threatening him, put Hall on notice of an "excessive risk" to Plaintiff's safety, Hall cannot be held liable because he responded reasonably to the risk.  Hall did not have the authority to make cell changes (*see id.*, Ex. A ¶ 8), but he took Plaintiff immediately to see the unit manager, Defendant Castro (*id.*, Ex. A ¶ 9).  Therefore, Hall apparently did everything in his power to address Plaintiff's concerns.  Similarly, Defendant Castro responded reasonably to the risk and cannot be held liable.  Castro promised to separate Plaintiff and Eason "the very next day," but Plaintiff was attacked by Eason right after the meeting with Castro (*id.*, Ex. A ¶ 10).  Therefore, at most, Castro was negligent in failing to separate Plaintiff and Eason immediately after the meeting.  However, Plaintiff has not shown that Castro recklessly disregarded the risk by deciding to wait until the following day to separate Plaintiff and Eason.

For these reasons, Plaintiff's claims against Defendants Runyon, Hall, and Castro are subject to dismissal.

        D.      Inadequate Medical Treatment Claim

Additionally, Defendants move for summary judgment on the ground that Plaintiff cannot establish a violation of his Eighth Amendment right to medical care that is not grossly inadequate. It is well settled that the government has a constitutional duty to provide minimally adequate medical care to prisoners.  Harris v. Thigpen, 941 F.2d 1495, 1504 (11th Cir. 1991).  Medical treatment violates the Eighth Amendment "only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'"  Id. at 1505 (quoting Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986)).  Incidents of mere negligence or malpractice do not rise to the level of constitutional violations.  Id. (citing Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)).  Similarly, a difference in medical opinion between the medical staff and an inmate as to the inmate's diagnosis or course of medical treatment does not support a claim of cruel and unusual punishment.  Id.

Stating an Eighth Amendment claim for inadequate medical care requires satisfying both an objective and subjective component.  Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000).  First, there must be conduct by prison officials which, objectively speaking, is "sufficiently serious" to constitute a deprivation "'denying the minimal civilized measure of life's necessities.'"  Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324, 115 L. Ed. 2d 271 (1991)).  Second, the prison officials must possess a subjective intent to use the medical deprivation as a means of punishment.  Id.

Both the objective and subjective components encompass two subsidiary requirements. Taylor, 221 F.3d at 1258.  As to the objective prong, an objectively serious deprivation requires showing an objectively "serious medical need."  Estelle, 429 U.S. at 104.  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994), abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002); see also Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977, 128 L. Ed. 2d 811 (1994) (serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm").  In addition, an objectively serious deprivation requires showing the response made by Defendants to that need was so deficient as to constitute "an unnecessary and wanton infliction of pain."  Estelle, 429 U.S. at 105–06 (internal

quotation marks omitted); *see* Taylor, 221 F.3d at 1257; *see also* Adams v. Poag, 61 F.3d 1537, 1543–44 (11th Cir. 1995).

To show the required subjective intent to punish, Plaintiff must demonstrate that Defendants acted with an attitude of "deliberate indifference." Estelle, 429 U.S. at 105. "Deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245–46 (11th Cir. 2003) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)); Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need"). Deliberate indifference must be more than a medical judgment call or an accidental or inadvertent failure to provide adequate medical care. Murrell v. Bennett, 615 F.2d 306, 310 n.4 (5th Cir. 1980).[11] "Summary judgment must be granted for the defendant official unless the plaintiff presents evidence of the official's subjective knowledge, as follows: 'since a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness.'" Campbell v. Sikes, 169 F.3d 1353, 1364 (11th Cir. 1999) (quoting Steele v. Shah, 87 F.3d 1266, 1269 (11th Cir. 1996)).

A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference. Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir. 1994). However, where the inmate has received medical treatment, and the dispute is over the adequacy of that treatment, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. Thigpen, 941 F.2d at 1507 (quoting Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989)). To do otherwise would be "to constitutionalize claims that sound in tort law." Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985) (internal quotation omitted).

Viewing the evidence in the light most favorable to Plaintiff, he has failed to establish that Defendants Seay, Morales, and Barrios violated his Eighth Amendment rights by providing grossly inadequate medical treatment. To the extent that Defendants Seay, Morales, and Barrios were

---

[11]In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

individually involved in treating Plaintiff, he has not shown that his medical care violated either the objective or subjective prongs of Eighth Amendment analysis.  First, Plaintiff has not satisfied the objective prong.  Although Plaintiff contends that Defendant Morales failed to show concerns for Plaintiff's injuries (Doc. 6 at 7) and that Morales denied Plaintiff treatment on August 16, 2002 (Doc. 76, Ex. A ¶ 13), Plaintiff does not dispute that he received frequent medical care immediately after and in the days following the altercation.  Plaintiff admits that he was examined and given Motrin for his pain immediately after the altercation on August 15, 2002 (Doc. 76 at 2).  Further, Plaintiff was seen again, evaluated, and prescribed medication on August 19, 22, 23, 27, and 28, and September 3, 4, and 7, 2002 (Doc. 76 at 3–4, Ex. A ¶¶ 16–18; Doc. 47, Ex. 3 at 2–6, 43).[12]  In total, Plaintiff was seen three times in the week following the altercation and nine times in the three weeks following the altercation.  Thus, Plaintiff has not shown that Defendants' response to his medical needs was so deficient as to constitute an unnecessary and wanton infliction of pain.

Next, regarding the subjective prong, Plaintiff has not shown that any of the Defendants acted with the requisite deliberate indifference.  Plaintiff alleges that Defendant Morales denied him treatment on August 16, 2002, but Plaintiff does not allege that Morales knew of and disregarded a risk that serious harm to Plaintiff would occur if Plaintiff was not treated on August 16.  Indeed, the fact that Plaintiff was treated on August 15 and 19 suggests that Morales was reasonable in his conclusion that Plaintiff did not need treatment on August 16.  Next, Plaintiff contends that Defendant Morales should not have given him Motrin on August 19 after Plaintiff informed Morales that he could "not take motrin alone in high dosages or long periods of time because it causes internal bleeding" (Doc. 76, Ex. A ¶ 15).  However, Plaintiff does not allege that he was told to take the Motrin alone, and he admits that August 19 was only the second time he received Motrin for his injuries, so there is no evidence that Defendant Morales disregarded a risk that Plaintiff would bleed internally.  Further, as soon as Plaintiff reported that he might be bleeding internally, he was

[12]Plaintiff claims that on August 22, 23, and 27, 2002, no "physical examination" was done to his back and neck (Doc. 76, Ex. A ¶¶ 16–18).  However, Plaintiff's medical records establish, and Plaintiff does not dispute, that on August 23 and 27, at the very least, medical staff observed Plaintiff's movement of his back and neck, reviewed his records, ordered x-rays, and prescribed him drugs for his pain (Doc. 47, Ex. 3 at 4–5, 43).  Further, Plaintiff's records establish and Plaintiff does not dispute that his August 22 appointment was held to evaluate his claim of blood in his stool; during that time, medical staff conducted a full rectal examination to evaluate Plaintiff's claim (id., Ex. 3 at 3).

examined thoroughly and no internal bleeding was found (Doc. 76, Ex. A ¶ 16; Doc. 47, Ex. 3 at 3). Finally, Plaintiff disputes the adequacy of his medical treatment, namely the fact that he was not given stronger pain medication than Motrin (*see* Doc. 76 at 2; Doc. 47, Ex. 3 at 3; Doc. 6 at 7). However, a dispute over the adequacy of treatment, without more, does not give rise to an Eighth Amendment claim.

Finally, regarding Defendants Barrios and Seay, Plaintiff does not allege facts specifically connecting them to his medical care, except in their supervisory capacities.  To the extent that Plaintiff seeks to hold Defendants Barrios or Seay liable for their failure to supervise the medical staff's treatment of Plaintiff (*see* Doc. 6 at 7–8), Plaintiff's claim is subject to dismissal because supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.  *See* Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks and citations omitted).  Supervisory liability may occur, however, either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation.  *Id.* (citation omitted).  This connection may be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so, or when a supervisor's custom or policy 'result[s] in deliberate indifference to constitutional rights' or when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'"  *Id.* (internal quotation marks and citations omitted); Wayne v. Jarvis, 197 F.3d 1098, 1105 (11th Cir. 1999).

Isolated incidents are generally insufficient to establish a supervisor's liability, and filing a grievance with a supervisory person does not alone make the supervisor liable for the allegedly violative conduct brought to light by the grievance, even if the grievance is denied.  Wayne, 197 F.3d at 1106; Weaver v. Toombs, 756 F. Supp. 335, 337 (W.D. Mich. 1989), *aff'd*, 915 F.2d 1574 (6th Cir. 1990); *see also* Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984).  Knowledge imputed to the supervisor "must be so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights."  Tittle v. Jefferson County Com'n, 10 F.3d 1535, 1542 (11th Cir. 1994).  The failure to act or implement policy must be in the face of

repeated violations or other indicators signifying a strong likelihood that the situation will recur. *See* Harris v. City of Marion, 79 F.3d 56, 58-59 (7th Cir. 1996).  Supervisors are generally entitled to rely on their subordinates to respond appropriately to situations absent clear or widespread evidence to the contrary.  "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous."  Cottone, 326 F.3d at 1360 (internal quotation marks and citation omitted).

As discussed above, Plaintiff has not established that any of his constitutional rights were violated by the medical staff's treatment of his injuries.  Further, Plaintiff has not alleged that either Defendant Barrios or Seay caused the alleged deprivation of rights or that either Defendant knew of a widespread custom or policy of giving inmates inadequate medical treatment.  Therefore, Defendants Barrios and Seay cannot be held liable on the basis of respondeat superior.

For these reasons, Plaintiff's claims against Defendants Morales, Barrios, and Seay are subject to dismissal.[13]

E.      Due Process Claim

Finally, Plaintiff has failed to state a due process claim.  In order to prevail on a due process claim, Plaintiff must first demonstrate that the BOP's inmate grievance procedure provided him with a constitutionally protected interest.  *See* Baker v. Rexroad, 159 Fed. Appx. 61, 62, 2005 U.S. App. LEXIS 22765, **1 (11th Cir. Oct. 20, 2005), *cert. denied*, 2006 U.S. LEXIS 6513 (Oct. 2, 2006). In Baker, the Eleventh Circuit agreed with other circuits that have held that the provision of an administrative grievance process is not constitutionally mandated.  *Id.*, 159 Fed. Appx. at 62–63 (citing Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state."); Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir.1993) (per curiam) (holding that a state-created prison grievance procedure is simply a procedural right and does not confer any substantive right upon an inmate); Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991) (per curiam) (holding that federal prison

_____

[13]Plaintiff also contends that he was denied treatment for approximately three weeks while he was incarcerated at USP Atlanta, but he has not named any of the Atlanta medical staff as Defendants in this action, nor has he alleged any facts connecting Defendants Morales, Seay, or Barrios (all staff at FCI Marianna) to the alleged deprivation of care in Atlanta.

administrative remedy procedures "do not in and of themselves create a liberty interest in access to that procedure," and that "the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance"); <u>Mann v. Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988) ("There is no legitimate claim of entitlement to a grievance procedure.")).

     In support of his due process claim, Plaintiff alleges the following facts.[14]  During the first week of September, Plaintiff requested two BP-9 forms from Defendant Carey, and Carey brought Plaintiff the forms (Doc. 76, Ex. A ¶ 21).  On September 15, 2002, Plaintiff gave Carey his BP-9 against Runyon, and Carey told Plaintiff that the grievance would be given to Defendant Kessler to be filed and processed (<i>id.</i>, Ex. A ¶ 23).  On September 18, Plaintiff gave his BP-9 grievance against the medical staff to Officer Daub as he was being transferred, and Daub told Plaintiff that she would forward it to Defendant Carey (<i>id.</i>, Ex. A ¶ 24).  Based on these facts, Plaintiff contends that both Defendants Carey and Kessler violated his due process rights (Doc. 6 at 6–7).

     Initially, Plaintiff has neither alleged nor offered proof that Defendant Kessler ever received or even knew of either of Plaintiff's BP-9 grievances.  Therefore, Plaintiff has not connected Defendant Kessler to the alleged constitutional violation in any way, so he cannot state a claim against Kessler.  Even so, Plaintiff has not made the threshold showing that he has a constitutionally protected interest in the grievance procedure.  <i>See</i> <u>Barlow</u>, 997 F.2d 494 (finding that no constitutional right was violated by prison officials' failure to process the grievances he submitted for consideration, because a prison grievance procedure "does not confer any substantive right upon the inmates" and "does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment").  Therefore, Plaintiff's claim that Defendants Kessler and Carey violated his Due Process rights is subject to dismissal.

    IV.    CONCLUSION

     Upon consideration of Plaintiff's claims and the evidence submitted, the undersigned concludes that there exists no genuine issue of material fact.  Plaintiff has failed to demonstrate that

---

[14]Defendants have provided no evidence regarding whether or not Defendants Carey or Kessler received Plaintiff's BP-9 complaints, so for purposes of this decision, the court will take as fact those allegations in Plaintiff's sworn affidavit that comply with the requirements for affidavits specified in Rule 56(e).

Case No.: 5:04cv228/SPM/EMT

he exhausted his administrative remedies.  Moreover, even if Plaintiff had exhausted his administrative remedies, he has failed to establish a violation of either the Eighth Amendment or the Due Process clause.  Thus, as a matter of law, Defendants are entitled to judgment in their favor.

Accordingly it is respectfully **RECOMMENDED**:

1.      That Defendants' motion for summary judgment (Doc. 47) be **GRANTED**.

2.      That the clerk be directed to enter judgment accordingly and close the file.

At Pensacola, Florida this <u>17</u><sup>th</sup> day of October 2006.


<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**Any objections to these proposed findings and recommendations must be filed within ten (10) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**